**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **1:11-cr-462-WSD-GGB** |
| **ARMANDO SOTO-ENRIQUEZ, NORMAN ISAI ALARCON-MEJIA,** | |
| **Defendants.** | |

## OPINION AND ORDER

This matter is before the Court on Magistrate Judge Gerrilyn Brill's Final

Report and Recommendation ("R&R") [155] recommending that this Court deny

Defendant Norman Isai Alarcon-Mejia's ("Mejia") Motion to Suppress Evidence

[74] and Motion to Suppress Identification [76]; and Defendant Armando Soto-

Enriquez' ("Soto") Motion to Suppress Evidence [80] and Motions to Suppress

Identification (collectively "Motions to Suppress") [81, 82].  Defendant Mejia filed

objections ("Objections") [157] to the R&R.  Defendant Soto filed a Motion to

Adopt Co-Defendant's Objections to Final Report and Recommendation ("Motion

to Adopt") [159].

## I.  BACKGROUND

Defendants Mejia and Soto have been indicted on charges of: (1) conspiracy to possess with the intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(i), (b)(1)(A)(ii), and (b)(1)(A)(viii); (2) possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii), and 18 U.S.C. § 2; (3) possession of heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(i), and 18 U.S.C. § 2; and, (4) possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii), and 18 U.S.C. § 2 [122].

On November 23, 2011, Mejia filed his motion to suppress evidence [74] and on November 28, 2011, he filed his motion to suppress identification [76].  On November 30, 2011, Soto filed his motion to suppress evidence [80] and filed two motions to suppress identification [81, 82].

On January 18, 2012, Magistrate Judge Brill held an evidentiary hearing on the Motions to Suppress [96].  Following the hearing, Defendants filed a joint post-hearing brief in support of their motions [120].  The brief narrowed Defendants' grounds for suppression of evidence and identity to two alleged Fourth Amendment violations: (1) the agents did not have reasonable suspicion to initiate

an investigative traffic stop; and (2) the subsequent warrantless arrests of

Defendants were not supported by probable cause.  Defendants also argued that the

following evidence must be excluded as fruit of the poisonous tree:

1) all statements made during the course of the detention;
2) any items found in Defendants' possession;
3) the on-scene identification of Defendants by Aguilar, a cooperating witness;
4) all statements made post-arrest;
5) any evidence discovered in the search of Defendants' hotel rooms;
6) all observations and information gathered by the agents during the course of the detention; and
7) any other evidence or information the Government obtained as a result of the detention.

On April 11, 2012, the Government filed its Response in Opposition to

Defendants' Motions to Suppress ("Response") [148].  In its Response, the

Government argued that Defendants were lawfully detained during an

investigatory traffic stop based upon reasonable suspicion that they were engaged

in criminal activity, and that Defendants' arrests were based on probable cause.[1]

On May 15, 2012, Magistrate Judge Brill issued her R&R.  Magistrate Judge

Brill addressed each of Defendants' alleged Fourth Amendment violations and

---

[1] Although Defendants' only grounds for suppression were the legality of the initial stop and their arrests, in an abundance of caution, the Government's Response also addressed the following issues: (1) the search incident to arrest; (2) the consent search of the car; (3) the waiver of Defendants' Miranda rights; (4) the showup identification; (5) the consent search of the hotel rooms; and (6) the reach of the fruit of the poisonous tree doctrine.

concluded that the agents had a reasonable, articulable suspicion that Defendants were engaged in criminal activity sufficient to support an investigatory traffic stop, and that, after the initial stop, there was probable cause to arrest Defendants. Magistrate Judge Brill recommended that the Motions to Suppress be denied.

## II.    STATEMENT OF FACTS[2]

On August 24, 2011, agents of the United States Customs and Border Patrol intercepted a tractor-trailer crossing the U.S.-Mexico border in Texas.  (Tr. of Suppression Hr'g at 2, 10; R&R at 2).  The tractor-trailer contained cocaine concealed inside a cover load of frozen squid.  (Tr. of Suppression Hr'g at 3, 9; R&R at 2).

On August 27, 2011, agents with the Homeland Security Investigations ("HSI") unit of the Department of Immigration and Customs Enforcement ("ICE") performed a controlled delivery of the shipment to a warehouse in Atlanta to investigate the underlying conspiracy and to identify the individuals involved.  (Tr.

---

[2] In his Objections, Defendant Mejia refers to two of the Magistrate Judge's findings of fact as "facts."  The Court construes the Objections as meaning that Defendants Mejia and Soto contest the following findings of fact: (1) Mejia's alleged inability to recall the name of the hotel where he was staying; and (2) the alleged showup identification of Mejia.  Having reviewed the record and transcript, the Court finds it is undisputed that Mejia could not recall the name of the hotel where he was staying, and that a showup identification occurred.  To the extent Mejia or Soto objects to these factual findings of the Magistrate Judge, the objection is overruled.

of Suppression Hr'g at 3, 10; R&R at 2).  The warehouse is located behind two other buildings in an industrial area of Atlanta.  (Id.).  A long driveway between the two buildings leads to the warehouse.  (Id.).

The warehouse and surrounding area was under twenty-four (24) hour surveillance when the delivery was made on August 27, 2011.  (Tr. of Suppression Hr'g at 3, 10-11).  The agents who testified at the suppression hearing stated that, at delivery, the smell of rotting fish reached as far as a quarter mile away from the warehouse.  (Id. at 12).

A.      Events of September 3, 2011

On September 3, 2011, the agents observed two individuals enter the warehouse.  (Id. at 3, 13).  Twenty (20) to thirty (30) minutes later, they exited the warehouse and left in a car.  (Id. at 13).  The Georgia State Patrol, after observing a traffic violation, stopped the departing car.  (Id. at 3, 13; R&R at 3).  The trooper identified Defendant Soto as a passenger in the vehicle.  (Tr. of Suppression Hr'g at 14).  The trooper also noted a strong odor of rotten squid emanating from the car, signaling that the car's occupants had recently been close to the warehouse where the drugs discovered in Texas on August 24th had been delivered.  (Id. at 15).  After the traffic stop, the car was allowed to continue its travel.

B.     Events of September 4, 2011

On the afternoon of Sunday, September 4, 2011, the agents observed a white box truck arrive at the warehouse.  (Id. at 3, 15-16).  When the truck departed the warehouse, the agents stopped it and found 180 kilograms of cocaine in the truck.[3]  (Id.).

Later that night, at approximately 8:30 p.m., as agents were preparing to execute a search warrant on the warehouse, they noticed a car pull into the driveway leading to the warehouse.  (Id. at 3-4, 142).  HSI Special Agent Jason Tyler ("SA Tyler") advised the other agents over the radio, including HSI Supervisory Special Agent Jeffrey DaRin ("SSA DaRin"), that the car was present in the driveway.[4]  (Id. at 17, 142).  SA Tyler asked whether the car was occupied by other law enforcement personnel involved in the investigation.  (Id. at 142).  SA Tyler testified further: "because for somebody else to be there would have been out of the ordinary."  (Id. at 147).  The car drove twenty (20) to twenty-five (25)

---

[3] The legality of the September 3, 2011, traffic stop of the vehicle, and the September 4, 2011, traffic stop of the box truck has not been challenged by Defendants.

[4] SSA DaRin is a supervisory special agent with ICE's Homeland Security Investigations.  (Tr. of Suppression Hr'g at 8).  He has been with ICE since 2002.  (Id.).  Prior to ICE, SSA DaRin served as a police officer for ten years, during which time he specialized in narcotics investigations.  (Id. at 8-9).

feet into the driveway before stopping, turning around, and exiting.[5] (Id. at 59;

R&R at 4).

After the vehicle entered the warehouse driveway and abruptly turned

around, SSA DaRin decided to initiate a traffic stop of the vehicle.[6] (Tr. of

Suppression Hr'g at 17). The stop occurred at approximately 8:35 p.m. (Id. at 22).

SSA DaRin based his decision to stop the car on the fact that the car was unusually

present in an industrial area, on a Sunday night when most businesses were closed,

and headed towards a warehouse and turned around when the driver was able to

---

[5] The R&R states that the vehicle was turned away by fire department personnel.
(R&R at 4). The only testimony in the record is that SSA DaRin recalled hearing
SA Tyler report that there was interaction between the car and fire department
personnel. (Tr. of Suppression Hr'g at 17). SSA DaRin was not in a position from
which he could see the car enter the driveway. (Id. at 21, 31, 33). A closer review
of the suppression hearing transcript shows that HSI Special Agent James Ballard
("SA Ballard") testified at the suppression hearing that the car "stopped
suddenly"—that is, "the vehicle seemed to pull in . . . and stop when it saw—it
looked like it saw the police cars and stopped." (Id. at 60). SA Tyler similarly
testified that he "saw headlights pull into the entranceway and stop. A few seconds
later the headlights backed up, and the vehicle pulled away." (Id. at 142). SA
Tyler further testified that while it was possible that Defendants interacted with fire
department personnel, he did not see any interaction. (Id. at 147).
        SA Tyler did not testify that he reported interaction between the car and fire
department personnel. (Id. at 142). Having conducted a *de novo* review of the
testimony at the suppression hearing, the Court finds the testimony of the agents
who witnessed the vehicle's movements while in the driveway to be persuasive
and that the vehicle entered the driveway and abruptly turned around on its own
after seeing police and fire personnel. This finding supports the Court's finding in
footnote 14.
[6] Special Agents Ballard and Tyler followed SSA DaRin to provide support. (Tr.
of Suppression Hr'g at 23, 143).

see law enforcement and fire personnel near the warehouse where drugs had been unloaded and fire department personnel had interacted with them. (Id. at 17-18). SSA DaRin knew drugs had been delivered to the warehouse and he had conducted surveillance of the warehouse throughout the week, noting very little through traffic, even on weekdays, at the time of day that this incident occurred.[7] (Id. at 11-12, 17). SSA DaRin testified that "the only vehicles we had ever seen pull into that driveway were vehicles that were either going to our target location or employees of the recycling business that it was attached to, and that recycling business . . . was closed" when the car drove down the driveway that Sunday night.[8] (Id. at 17).

After checking the vehicle occupants' identification documents, the agents identified the car's driver as Defendant Soto and the front seat passenger as Defendant Mejia.[9] (Id. at 4, 22-23). SSA DaRin knew Soto because he had witnessed the September 3rd traffic stop and immediately recognized him as one of the individuals who had been observed previously entering the warehouse. (Id. at

[7] SSA DaRin testified that in the week following the controlled delivery, he twice conducted surveillance during the dayshift and had conducted nightshift surveillance approximately four times. (Tr. of Suppression Hr'g at 37-38).
[8] Officers who observed the car enter the driveway, when it was dark, on a Sunday night, and abruptly turn around when police and fire department activity was visible, testified that it was "strange." (Tr. of Suppression Hr'g at 59-60).
[9] The charges against the backseat passenger, Jaimes-Avila ("Avila"), have been dismissed [121].

13, 22).  After the car was stopped, SSA DaRin asked Soto where he was going.

(Id. at 24).  Soto responded that he was lost and was looking for his hotel.[10]  (Id. at

24, 42).  SSA DaRin asked Soto to step out of the vehicle and proceeded to pat him

down.  (Id. at 25).  The pat down was conducted to ensure his and others' personal

safety.  (Id.).  SA Ballard read Soto his Miranda rights, which Soto waived.  (Id. at

25-26, 62-65).[11]

The vehicle's other two occupants, Avila and Defendant Mejia, were also

patted down and their Miranda rights were read.  (Id. at 26).  The pat downs

revealed keys to two hotel rooms, multiple cell phones, and their personal

identification documents.  (Id. at 27-28, 51; R&R at 5).

SA Ballard spoke with Soto, Mejia, and Avila separately for approximately

ten (10) minutes each.  (Tr. of Suppression Hr'g at 67).  They each denied any

knowledge of the warehouse or it contents, despite the fact that Soto had been

inside the warehouse the previous day.  (Id. at 46-47, 68).  Soto told SA Ballard

that he is a Mexican businessman and had traveled to Atlanta for business and to

shop.  (Id. at 68).  Mejia and Avila gave similar explanations for being in Atlanta.

[10] The address for the Rodeway Inn & Suites where Defendants had rented two
rooms was subsequently found in the vehicle's GPS unit.  (Tr. of Suppression Hr'g
at 43-44, 91).  The hotel was located two (2) to three (3) miles away from the
warehouse.  (Id. at 53).
[11] Only ten (10) to fifteen (15) minutes elapsed between the time the car was
stopped and Soto's Miranda rights were read.  (Tr. of Suppression Hr'g at 26, 67).

(Id.).  Neither Soto or Mejia could remember the name of the hotel where they were staying.  (Id.).  During the interviews, Defendants were not handcuffed.  (Id. at 26, 68).  Their demeanor was described as calm and cooperative.  (Id. at 26).

SA Ballard asked for and received consent from Soto to search the car.  (Id. at 5, 28, 69-71).  The search lasted less than ten (10) minutes and the rental agreement for the vehicle and shopping bags in the trunk were the only items found in the car.  (Id. at 72).

HSI Special Agent Antonio Moronta ("SA Moronta"), who was present at the stop of the car, also spoke with Soto.  (Id. at 130).  SA Moronta testified that Soto stated that he was from Mexico, that he was visiting some friends, that he had just met the other two individuals in the car, and that he did not know them prior to coming to the United States.  (Id. at 131).  Despite that, Soto told SA Moronta that they were staying together at their hotel.  (Id.).  Soto stated further that he was in the United States to purchase a camera lens and that he was a masseuse and a photographer.  (Id.).  SA Moronta's conversation with Soto lasted five (5) to ten (10) minutes.  (Id.).  Avila and Defendant Mejia declined to respond to similar questions about their activities in Atlanta.  (Id. at 132-33).

Soto, Mejia, and Avila each signed consent-to-search forms, consenting to the search of their hotel rooms.[12] (Id. at 133).

Approximately one and a half to two hours after the stop was initiated, the agents brought another co-defendant in this case, Edgar Ramos Gonzales, a/k/a Ector Javiar Aguilar ("Aguilar"), to the scene to conduct a showup identification. (Id. at 5, 50). Aguilar was in the box truck that had removed cocaine from the warehouse earlier that day, and after the stop had told the agents about a meeting the night before at Defendants' hotel where the movement of the drugs from the warehouse was discussed. (Id. at 5, 98, 106-107).

Special Agent Steven Ledgerwood ("SA Ledgerwood") transported Aguilar to the location of the stopped car. (Id. at 99). SA Ledgerwood testified that he did not speak with Aguilar about the traffic stop, did not describe any of the vehicle's occupants, did not mention any names, and did not show him any photographs. (Id. at 98-100). SA Ledgerwood only told Aguilar that agents had detained several individuals and they wanted to see if Aguilar could identify them. (Id. at 99).

When they arrived at the stop location, Aguilar remained in the car. (Id. at 100). The agents instructed Avila, Soto, and Mejia to walk, one at a time, in front of the car's headlights. (Id.). At the showup identification, Aguilar identified

---

[12] A search warrant was later secured for the search of the rooms. (Tr. of Suppression Hr'g at 5).

Mejia and Avila as two of the individuals present at the hotel meeting where the drugs were discussed.  (Id. at 106-107).[13]  Aguilar did not identify Soto as being at the meeting.  (Id. at 101).

The agents arrested Soto, Mejia, and Avila and transported them to ICE's office where Defendants were again read their <u>Miranda</u> rights.  (Id. at 5, 122-23). Defendants again waived their rights, and Defendants each made a variety of statements to the interviewing agents.  (Id. at 125-26).

## III.    STANDARD OF REVIEW

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59; <u>Williams v. Wainwright</u>, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam), <u>cert. denied</u>, 459 U.S. 1112 (1983).  A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party."  <u>Jeffrey S. v. State Bd. of Educ. of</u>

---

[13] During the suppression hearing, the Government stated that "Mr. Aguilar later gave a proffer where he said that in fact Mr. Jaimes-Avila was not at that drug meeting."  (Tr. of Suppression Hr'g at 5).

Ga., 896 F.2d 507, 512 (11th Cir. 1990) (internal citations omitted). With respect to those findings and recommendations to which a party has not asserted objections, the Court must conduct a plain error review of the record. United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983), cert. denied, 464 U.S. 1050 (1984).

Defendant Mejia asserts objections to two of the Magistrate Judge's conclusions. See Macort v. Prem, Inc., 208 F. App'x 781, 784 (11th Cir. 2006) ("It is critical that the objection be sufficiently specific and not a general objection to the report."); Heath v. Jones, 863 F.2d 815, 822 (11th Cir. 1989) ("[T]o challenge the findings and recommendations of the magistrate [judge], a party must . . . file . . . written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection."); Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988) ("Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to. Frivolous, conclusive, or general objections need not be considered by the district court."). First, Mejia argues the traffic stop was not supported by reasonable suspicion. Second, Mejia contends that his arrest was illegal because it was not supported by probable cause.

Defendant Soto moved to adopt Mejia's two objections. Because Soto was present with Mejia and subject to the same investigatory traffic stop, Mejia's first objection to the findings and recommendations of the Magistrate Judge regarding reasonable suspicion is sufficiently specific and equally applicable to Soto's challenge to the legality of his being subject to an investigatory stop. See id. The Court grants Soto's motion to adopt Mejia's first objection.

The Court denies Soto's request to adopt Mejia's second objection as his own regarding the probable cause determination for Mejia's arrest. The Court finds the factors the Magistrate Judge cited as constituting probable cause for Mejia's arrest to be factually and legally distinct from those cited for Soto's arrest. As such, the Court finds Mejia's second objection does not apply to Soto's challenge to the existence of probable cause for his arrest and, thus, is not a valid objection. See id.

With regard to the findings and recommendations of the Magistrate Judge to which Defendants have not validly objected, including the Magistrate Judge's finding of probable cause for the arrest of Defendant Soto, the Court finds that the Magistrate Judge did not plainly err and they are adopted by the Court.[14]

---

[14] Even if Soto had validly objected to the R&R on the ground that there was a lack of probable cause for his arrest, the Court would find any such objection to be without merit. The agents observed Soto entering the warehouse after the delivery

## IV. DISCUSSION

### A.   The Stop of Defendants' Car

Defendants first object to the Magistrate Judge's finding that the initiation of the traffic stop was constitutional.  Defendants contend that the facts known to SSA DaRin at the time of the stop did not constitute reasonable suspicion to conduct the stop.  The Court disagrees.

### 1.   *Legal Standard*

A law enforcement official may conduct an investigatory stop if there is reasonable suspicion that the person has engaged or is about to engage in criminal activity.  United States v. Arivizu, 534 U.S. 266, 273 (2002); Terry v. Ohio, 392 U.S. 1, 21 (1968); United States v. Hunter, 291 F.3d 1302, 1305–06 (11th Cir. 2002) (citing Terry, 392 U.S. at 30) ("[A]n officer may conduct a brief, warrantless, investigatory stop of an individual when the officer has a reasonable, articulable suspicion that criminal activity is afoot, without violating the Fourth

---

of drugs; identified him as an occupant of the car that was stopped on September 3, 2011, leaving the warehouse and smelling of rotten squid; and Soto was driving the car that abruptly stopped and turned around when law enforcement activity was observed at the warehouse on September 4, 2011, while in the company of Mejia and Avila whom Aguilar had identified as being present at a meeting the night before where the movement of the drugs in the warehouse was discussed.  The Court finds these facts provided the agents with a sufficient basis to find probable cause existed to believe Soto was engaged in or had committed a crime.  See footnote 5.

Amendment."). This standard similarly governs investigative stops of vehicles. United States v. Sokolow, 490 U.S. 1, 7–8 (1989); United States v. Sharpe, 470 U.S. 675, 682 (1985); United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008) (citing Terry, 392 U.S. 1).

Reasonable suspicion requires less proof than a finding of probable cause. See United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990). When reviewing whether reasonable suspicion exists, courts must look at the "totality of the circumstances" to determine whether the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing. Arivizu, 534 U.S. at 273. "[T]he 'reasonableness' standard requires that a police officer be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant [the] intrusion." United States v. Mikell, 102 F.3d 470, 474–75 (11th Cir. 1996), cert. denied, 520 U.S. 1181 (1997) (internal quotation marks omitted). However, "[i]t does not require officers to catch the suspect in a crime. Instead, a reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004) (internal quotation marks omitted); see also United States v. Powell, 222 F.3d 913, 918 (11th Cir. 2000) (quoting Illinois v. Wardlow,

528 U.S. 119, 125 (2000)) ("Even in <u>Terry</u>, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation.").

In determining if there is reasonable suspicion, law enforcement officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them . . . ." <u>Arivizu</u>, 534 U.S. at 273; <u>accord</u> <u>United States v. Lee</u>, 68 F.3d 1267, 1271 (11th Cir. 1995). Where there is at least minimal communication among agents in an investigation, the aggregation of the information known may support the existence of reasonable suspicion to detain. <u>See</u> <u>United States v. Glinton</u>, 154 F.3d 1245, 1257 (11th Cir. 1998); <u>United States v. Wilson</u>, 894 F.2d 1245, 1254 (11th Cir. 1990), <u>cert denied</u>, <u>Levine v. United States</u>, 497 U.S. 1029 (1990).

2.    *Analysis*

The Court considers whether SSA DaRin had an objectively reasonable suspicion that Defendants "had engaged, or [were] about to engage, in a crime" to justify the stop. <u>Acosta</u>, 363 F.3d at 1144–45. In doing so, the Court "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." <u>United States v. Hensley</u>, 469 U.S. 221, 228 (1985). The test "is grounded in the standard of reasonableness embodied in the Fourth Amendment." <u>Id.</u>

Considering the totality of the circumstances here, SSA DaRin had an articulable, reasonable suspicion sufficient to justify stopping the vehicle in which Defendant Soto was driving and in which Defendant Mejia was the front seat passenger. Reasonable suspicion is not probable cause and SSA DaRin was not required to wait until he observed Defendants engaging in criminal activity to initiate the traffic stop. See United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012) ("Reasonable suspicion need not involve the observation of illegal conduct . . . ."). Reasonable suspicion deals in probabilities, not hard certainties. Id. at 1302 (quoting United States v. Cortez, 449 U.S. 411, 419 (1981)). Defendants' conduct that was known to SSA DaRin at the time, collectively considered and based on his twenty years of law enforcement experience, supports that SSA DaRin had an articulable, reasonable suspicion that illegal activity was afoot to justify an investigative stop of the car. See Arivizu, 534 U.S. at 273; Sokolow, 490 U.S. at 7–8; Sharpe, 470 U.S. at 682; Terry, 392 U.S. at 21; Harris, 526 F.3d at 1337; Hunter, 291 F.3d at 1305–06; Mikell, 102 F.3d at 474–75. Specifically, SSA DaRin was aware that a truck containing cocaine with a cover load of squid was unloaded into the warehouse. The warehouse had been under constant surveillance from the time the truck was unloaded. The warehouse was in an industrial area with some daytime traffic to the few other businesses near the warehouse, but the

warehouse itself was infrequently visited and on one occasion visitors to the warehouse departed in a vehicle carrying cocaine. Surveillance showed little, if any, nighttime or weekend traffic to the area of the warehouse. The car SSA DaRin stopped arrived at night, on a Sunday, and while driving toward the warehouse, where blue and red flashing lights were present, the car stopped, perhaps when instructed by fire department personnel, turned around, and left. Based on the totalities of these circumstances, SSA DaRin believed he had reasonable suspicion of criminal activity on the part of one or more of the car occupants and decided to stop the vehicle, assisted by other agents, who observed even more suspicious activity.

Defendants argue that the only suspicious fact known to SSA DaRin was Defendants' mere presence in the driveway of a warehouse which had previously held drugs. They rely on Illinois v. Wardlow for the proposition that, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." 528 U.S. 119, 124 (2000). While reasonable suspicion cannot be based on mere presence, Wardlow further instructs: "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Id.

There was more than "mere presence" here. Defendants were on a driveway traveling to an area where illegal drug activity was known to be conducted. The driveway that Defendants entered led to a warehouse that had contained 180 kilograms of cocaine, only hours earlier. The warehouse and the driveway leading to the warehouse had been under constant surveillance for the seven days prior to the stop. During those seven surveillance days, agents had observed very little through traffic in the area at night. Even during the day, the only vehicles to enter the driveway were going either to the neighboring recycling business or to the warehouse in which drugs were located. The recycling business was closed at the time Defendants arrived that Sunday night.[15]  See United States v. Momodu, 909 F.

_____

[15] The Government contends that Defendants purposefully evaded law enforcement, a relevant factor in establishing reasonable suspicion. See Wardlow, 528 U.S. at 124; United States v. Gordon, 231 F.3d 750, 756 (11th Cir. 2000). It is undisputed that Defendants entered the driveway, and drove approximately twenty-five (25) feet, before turning around, and exiting the driveway. As noted above, the Court finds SA Ballard and SA Tyler's testimony at the suppression hearing that the car "stopped suddenly" and that "it looked like the [vehicle] saw the police cars and stopped," to be persuasive. (Tr. of Suppression Hr'g at 60, 142). SSA DaRin heard SA Tyler's radio message alerting the group to the car's presence. (Id. at 35). Because "reasonable suspicion is determined by the *collective* knowledge of the officers involved in the stop," the Court finds that Defendants' apparent attempt to evade law enforcement further supports a finding of reasonable suspicion. Glinton, 154 F.3d at 1257. Even if this knowledge cannot be imputed to SSA DaRin, and even if fire department personnel instructed Defendants to exit the driveway, the Court still finds the totality of the other information known to SSA DaRin was sufficient to support his reasonable suspicion that Defendants had engaged in or were about to engage in criminal conduct.

Supp. 1571, 1575 (N.D. Ga. 1995) (citing United States v. Briggman, 931 F.2d 705 (11th Cir. 1991) ("The time of day during which behavior is observed is a factor that is properly considered in analyzing reasonable suspicion."). SSA DaRin also knew that during the seven days of surveillance, investigators had stopped a vehicle leaving the warehouse and found cocaine in the vehicle.

The facts known to SSA DaRin amply support that he had an objectively reasonable suspicion that the Defendants may have intended to engage in criminal conduct and he was entitled to briefly detain Defendants to investigate that suspicion. See Powell, 222 F.3d at 918 (quoting United States v. Cruz, 909 F.2d 422, 424 (11th Cir. 1989)) ("While none of these factors, by themselves, necessarily justifies an investigatory stop, they are each relevant in the determination of whether the agents had reasonable suspicion to stop [Powell].").

Having conducted a *de novo* review of the objection to the Magistrate Judge's recommendation, the Court adopts the Magistrate Judge's conclusion that the initiation of the traffic stop was constitutionally valid, and Defendants' objection is overruled.

B.      Arrest of Defendant Mejia

Defendant Mejia next contends that his warrantless arrest violated his Fourth Amendment rights because law enforcement officials lacked probable cause to

arrest him. Mejia objects to the Magistrate Judge's reliance on two factors used to determine his arrest was based on probable cause: (1) Mejia's inability to recall the name of the hotel where he was staying; and (2) the positive identification of Mejia by a cooperating witness as one of the individuals present at a meeting where the transportation of the drugs was discussed. After careful review, the Court finds probable cause existed to arrest Mejia.

1.    *Legal Standard*

Probable cause exists to make a warrantless arrest "when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that [a] suspect had committed or was committing a crime." United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (quoting United States v. Gonzalez, 969 F.2d 999, 1002 (11th Cir. 1992)). Whether probable cause exists is evaluated based on the "totality of the circumstances." Illinois v. Gates, 462 U.S. 213, 233 (1983); see also United States v. Wai-Keung, 845 F. Supp. 1548, 1557 (S.D. Fla. 1994), aff'd, 115 F.3d 874 (11th Cir. 1997) (arresting officers entitled to assess "the totality of the circumstances and the inferences that flow from these circumstances").

2. *Analysis*

Mejia argues that any inability to recall the hotel's name should be discounted because his conversation with the agents was stressful and, thus, the Magistrate Judge cannot rely on his inability to recall the hotel name to support probable cause for his arrest. Mejia misunderstands the Magistrate Judge's analysis. Mejia's inability to recall the name of the hotel was only one of several facts and circumstances that reasonably led the agents to believe that there was probable cause to arrest him.

When asked by the agents to explain his presence at the warehouse, Mejia told the agents that he, Avila, and Soto were lost and were looking for their hotel. Mejia claimed he did not know the name of the hotel. The Rodeway Inn & Suites, where it was later determined that Defendants were staying, is located a short two (2) to three (3) miles from the warehouse, and it is located on a major interstate, not off a driveway populated by industrial warehouses and businesses. The address of the hotel was found in the GPS system in Defendants' car, making it unlikely that Defendants were "lost" in an industrial area of Atlanta looking for their hotel. See Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997) (probable cause must be evaluated "with the common sense view of the realities of normal life").

The arrest was also based in part on the Aguilar identification of Mejia at the showup identification in which Aguilar identified Mejia as someone who attended a discussion the previous day about how to transport the drugs that were in the warehouse.

Mejia next objects to the Magistrate Judge's use of the showup identification by Aguilar of him as a basis for probable cause. He claims the showup cannot be used for two reasons. First, in the affidavit attached to the criminal complaint, ICE Special Agent John Paul Clark ("SA Clark") stated that Aguilar informed the agents that he had met with a man named Poncho, who had instructed Aguilar how to move the drugs. SA Clark further stated in the affidavit that Aguilar told the agents that Avila was present at the meeting. Mejia contends that the omission of his name from the description of the meeting in the affidavit creates a "critical contradiction[] and inconsistenc[y]" with SA Ledgerwood's testimony at the suppression hearing. Second, Mejia points to the fact that during the showup identification, Aguilar stated that he recognized the car at the traffic stop as one he had observed at the hotel the night before. The rental agreement retrieved from the car showed that Defendants rented the car the day of the traffic stop.

SA Clark's affidavit and SA Ledgerwood's testimony are not inconsistent. The affidavit does not state that Aguilar told the agents that Avila and Poncho were

the only two individuals at the meeting. SA Ledgerwood's testimony was that Aguilar identified both Avila and Mejia as being present at the meeting. Nothing in the affidavit discredits that others were present as Aguilar stated at the time of the showup identification.[16]

Defendants further emphasize that Mejia, Soto, and Avila each separately told the agents the same innocent story—that is, that they are Mexican businessmen who traveled to the United States for business and for shopping, and that they knew nothing of the warehouse or its contents. This account was not credible considering that Soto, the car's driver, had the day before entered the warehouse where drugs were known to be located. This significant inconsistency in Soto's story further gave the agents reason to doubt Mejia. Mejia was a passenger in the car that Soto was driving, giving the agents reason to suspect a common enterprise. Soto also told the agents that although the men did not know each other prior to coming to the United States, they all were staying at the same

---

[16] The Court also does not find Aguilar's comment about the car sufficient to outweigh his subsequent identification of Mejia. SA Ledgerwood's testimony was that, upon arriving at the scene of the traffic stop, Aguilar "spontaneously" said, "Oh, that's the vehicle that was at the hotel the night before." (Tr. of Suppression Hr'g at 100). The car, a silver Nissan Altima, is almost certainly a common car model and Aguilar may have been mistaken on this point. That Aguilar later corrected his statement that Avila was at the meeting does not impact the information that was available to the arresting officers at the time of arrest. The Court also notes that Aguilar has not withdrawn his statement that Mejia was at the meeting.

hotel. Although it is true that "a person's mere propinquity to others independently suspected of criminal activity does not, *without more*, give rise to probable cause," the agents confirmed Mejia's involvement by bringing Aguilar, one of the individuals hired to move the cocaine, to the scene to conduct a showup identification and thus, the agents knew of Mejia's presence at the discussions about transportation of the drugs shortly before the arrest was made. Ybarra v. Illinois, 444 U.S. 85, 91 (1979) (emphasis added).

After a *de novo* review of Defendant Mejia's objection to the Magistrate Judge's finding of probable cause, the Court finds that the totality of the circumstances reasonably led the agents to believe that Mejia had engaged in criminal conduct. The Court adopts the Magistrate Judge's conclusion that probable cause existed to arrest Mejia, and Defendant's objection is overruled.

## V.    CONCLUSION

Having conducted a *de novo* review of the portions of the Magistrate Judge's Final Report and Recommendation to which Defendants raised objections, the Court finds that the initiation of the traffic stop and the subsequent arrests of Defendants did not violate Defendants' Fourth Amendment rights. Defendants' objections are overruled.

For the reasons stated above,

**IT IS HEREBY ORDERED** that the Court **ADOPTS** the Final Report and Recommendation of Magistrate Judge Gerrilyn Brill [155].

**IT IS FURTHER ORDERED** that Defendant Armando Soto-Enriquez' Motion to Adopt Co-Defendant's Objections to Final Report and Recommendation [159] is **GRANTED** in part and **DENIED** in part. For the reasons stated above, the Motion is **GRANTED** with respect to the objection to the investigative stop, and **DENIED** because Mejia's objection is directed only to the grounds for his, and not Soto's, arrest.

**IT IS FURTHER ORDERED** that Defendant Norman Isai Alarcon-Mejia's Motion to Suppress Evidence [74] and Motion to Suppress Identification [76] are **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Armando Soto-Enriquez' Motion to Suppress Evidence [80] and Motions to Suppress Identification [81, 82] are **DENIED**.

**SO ORDERED** this 24th day of July, 2012.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE